1  TODD M. MALYNN (SBN 181595)
   Email: tmalynn@feldmangale.com
2  JAMES A. GALE (Florida Bar No. 371726)
   Email: jgale@feldmangale.com
3  **FELDMAN GALE, P.A.**
   880 West First Street, Suite 315
4  Los Angeles, California 90012
   Telephone No. (213) 625-5992
5  Facsimile No. (213) 625-5993

6  Attorneys for Plaintiffs
   ST. JUDE MEDICAL S.C., INC., and
7  SARAH ELSENER

FILED
CLERK, U.S. DISTRICT COURT

FEB 21 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

8         IN THE UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  ST. JUDE MEDICAL S.C., INC., a      )  CASE No. CV14 - 1326 SVW (AGRx)
    Minnesota corporation, SARAH        )
11  ELSENER, an individual,             )  COMPLAINT FOR
                                        )  DECLARATORY RELIEF
12            Plaintiffs,               )
                                        )  DEMAND FOR JURY TRIAL
13        v.                            )
                                        )
14  BIOSENSE WEBSTER, INC., a           )
    California corporation,             )
15                                      )
              Defendant.                )
16  _____)

17

18      Plaintiffs St. Jude Medical S.C., Inc. ("St. Jude") and Sarah Elsener

19  ("Elsener") (collectively, "Plaintiffs"), for their Complaint against defendant

20  Biosense Webster, Inc. ("Biosense" or "Defendant"), allege based upon actual

21  knowledge with respect to Plaintiffs and their acts, and unless otherwise stated

22  upon information and belief as to all other matters, as follows:

                          **Introduction**

23      1.    This action is for declaratory relief pursuant to the Federal

24  Declaratory Judgment Act (28 U.S.C. §§ 2201 2202).

25      2.    Plaintiffs are seeking to resolve an actual controversy between

26  themselves and Defendant regarding the rights and obligations of the parties

27  relating to, and arising from, Elsener's Employee Secrecy, Intellectual Property,

28

1  Non-Competition and Non-Solicitation Agreement (the "Non-Competition
2  Agreement") with her former employer, Biosense. Specifically, Biosense has
3  taken the position that under Elsener's Non-Competition Agreement, Elsener
4  should be precluded from: i) engaging in the sale or support of *non-competitive*
5  products in her former Biosense accounts; ii) engaging in the sale of products
6  that she did *not* sell for her former employer, including products that Biosense
7  itself does not and did not sell; and iii) possibly engaging in the sale or support
8  of competitive products *outside* her former Biosense accounts.[1]
9      3.     Accordingly, this dispute involves whether Elsener can be legally
10 restricted, pursuant to the overly broad and onerous terms of the restrictive
11 covenants in her Non-Competition Agreement, from: i) selling and/or
12 supporting the sale of cardiac rhythm management ("CRM") devices for St.
13 Jude, when she had never sold or provided support for the sale of such devices,
14 or competing devices for Biosense; ii) selling and/or supporting the sale of
15 CRM devices for St. Jude, when Biosense does not make, manufacture, or sell
16 CRM devices; and iii) selling and/or supporting the sale of atrial fibrillation
17 ("AF") products that she did sell and/or support for Biosense, outside of the
18 accounts that she previously worked for Biosense (*see supra* at ¶ 2, n. 1).

19                    **The Parties, Jurisdiction, and Venue**

20     4.     This Court has subject matter jurisdiction of this controversy under
21 28 U.S.C. § 1332 as it is a controversy between citizens of different states
22 having an amount in controversy in excess of $75,000.00, exclusive of interest
23 and costs.

24

25 [1]  Biosense's February 6, 2014 letter to Elsener states that, "at a minimum,"
   compliance with the restrictions of the Non-Competition Agreement prohibits
26 Elsener from selling CRM and AF devices to her former accounts. Biosense's
   statement "at a minimum," in light of Biosense's previous interpretations of the
27 restrictive covenants at issue here prohibiting competitive activity outside of
   former accounts, Plaintiffs are in doubt as to whether Biosense believes that full
28 compliance with the Non-Competition Agreement further prohibits Elsener
   from selling AF products to accounts that she did not previously service.

                              COMPLAINT

1    5.    Plaintiff Elsener is a citizen of the State of Nebraska, residing in
2   Lincoln, Nebraska.  Elsener, who previously worked for Biosense, is currently
3   employed by St. Jude as a Principal Technical Service Specialist.
4         6.    Plaintiff St. Jude is a Minnesota corporation with its principal place
5   of business in Austin, Texas.
6         7.    Defendant Biosense, based on Plaintiffs' actual knowledge, is a
7   California corporation with its principal place of business in Diamond Bar,
8   California, which is located in this judicial district.
9         8.    Venue properly lies in this Court under 28 U.S.C. § 1391, as
10  Defendant Biosense resides in and conducts business in this judicial district.

**Arrhythmic Conditions of the Heart**

12        9.    Generally speaking there are many conditions that can affect the
13  ability of the heart to properly "beat" in a controlled and rhythmic fashion to
14  ensure that the proper flow of blood is maintained throughout the body.
15        10.   Sometimes, depending on the nature of the patient's condition,
16  these arrhythmic disorders can be treated with cardiac rhythm management (or
17  CRM) devices.
18        11.   CRM devices are relatively small devices that are permanently
19  implanted into the body of a patient to regulate a patient's heartbeat.  CRM
20  devices include implantable pacemakers, implantable defibrillators ("ICD"), and
21  other cardiac resynchronization ("CRT") products.  A pacemaker is used to treat
22  a slow heart rate, an ICD treats fast heart rates, and a CRT device typically
23  treats certain types of heart failure which may result from either: i) a lack of
24  synchronization between ventricles of the heart; or ii) reduced left ventricle
25  systolic function.  All of these devices are connected to the patient's heart via
26  other CRM devices called "lead wires" or "leads."
27        12.   Other patients, however, may suffer from a different cardiac
28  rhythm disorder, generally known as atrial fibrillation (or AF).  In AF, the upper

chambers of the heart "quiver" or "flutter" in a disorganized pattern rather than in a controlled and rhythmic beat, usually as a result of cardiac tissue "misfiring" and sending electrical impulses in a random or disorganized pattern. This prevents the heart from properly sending blood to the rest of the body.

13.    AF diseases are not diagnosed and treated by CRM devices, but rather, by the use of large expensive pieces of capital equipment called mapping devices.  These mapping devices are able to diagnose such conditions and identify problem areas of the heart.  Once such a condition has been diagnosed, other types of AF devices, such as radio frequency generators and "ablation catheters" are used to actually burn, or "ablate," the tissue in the heart, in order to assist the heart in establishing a normal rhythm.  Ablation works by destroying certain cardiac tissue responsible for causing the heart to beat irregularly.  By destroying such tissue, normal rhythm may then be restored.

14.    Unlike CRM devices, AF devices are not implanted into the patient's body.  Because AF devices are not implanted, they cannot constantly monitor the heart, and they cannot constantly deliver therapy to the heart.

15.    CRM devices do not treat AF, and AF devices do not treat CRM conditions.  CRM and AF devices are not interchangeable, and are not competitive.  Rather, they are very different and treat very different conditions.

**The Companies**

16.    St. Jude is a highly innovative company that markets and distributes both CRM and AF devices for use in conjunction with treating various cardiac arrhythmias.

17.    Biosense, in contrast, does not sell any CRM devices or the leads related to any CRM devices.

18.    Instead, Biosense's product line is primarily limited to AF devices, such as mapping devices and ablation catheters.

19.   Because they treat very different conditions in very different ways, St. Jude's CRM devices and leads do not compete with Biosense's AF devices.

**Biosense's Non-Competition Agreement**

20.   Previously, Elsener was employed by Biosense as a Clinical Account Specialist selling and supporting the sale of Biosense's AF products in certain accounts primarily in Elsener's former territory.

21.   As a Biosense employee, Elsener was required to sign Biosense's standard Non-Competition Agreement.   Attached hereto as Exhibit A is a copy of Elsener's Non-Competition Agreement.

22.   The Agreement states in pertinent part:

> during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access ....

*See* Non-Competition Agreement, ¶ 6, Section C.

23.   The Agreement also states:

> . . . during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed, or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment.

Non-Competition Agreement, ¶ 7, Section C.

24.   The Agreement's restrictions, at least as construed by Biosense, violate the public policy of the forum state (California and/or Nebraska), which should apply in light of the materially greater contacts with the forum.

## Biosense Wrongly Accuses Elsener of
## Violating Her Non-Competition Agreement

1
2
3       25.   Earlier this month, Elsener resigned from Biosense to begin
4   working for St. Jude as a Technical Service Specialist.
5       26.   As a St. Jude Technical Service Specialist, Elsener seeks to
6   provide: i) sales, and support for the sales of, St. Jude's *non-competitive* CRM
7   devices and leads in, among other places, her former Biosense accounts; and/or
8   ii) sales, and support for the sales of, competitive AF devices to customers and
9   potential customers of St. Jude to whom Elsener did *not* sell or service Biosense
10  products during the twelve (12) months prior to her departure from Biosense.
11      27.   Elsener has fully complied with *any* legally enforceable restrictions
12  set forth in the Non-Competition Agreement, including those set forth in the
13  above-quoted ¶¶ 6 and 7 of Section C of the Agreement.
14      28.   Nevertheless, by letter dated February 6, 2014, Biosense has taken
15  the position that Elsener may not sell CRM products to her former Biosense
16  accounts (even though Biosense itself does not make, manufacture or sell CRM
17  products), or sell AF products to a list of accounts that includes accounts that
18  she did not service or sell to during the twelve (12) months prior to her
19  termination with Biosense (*see supra* at ¶ 2, n. 1).   A copy of Biosense's
20  demand letter to Elsener is attached hereto as Exhibit B.
21      29.   By the same demand letter dated February 6, 2014, Biosense
22  informed Elsener that Elsener may not work for St. Jude *at all*, unless Elsener
23  informs Biosense of: i) the products Elsener will be promoting; ii) the territory
24  for which Elsener will be responsible; iii) Elsener's job title; iv) Elsener's job
25  responsibilities; and v) the customers Elsener will be servicing.   Ex. B.
26      30.   According to Biosense, Elsener would allegedly be violating her
27  Non-Competition Agreement by selling CRM products to Elsener's former
28

COMPLAINT

1   accounts, or by selling AF products to accounts to whom she did not sell to or

2   service during the one year period prior to her termination with Biosense.

3   ### Elsener Is Not Using Confidential Information

4       31.   Elsener has neither used nor disclosed any confidential information

5   in violation of her Non-Competition Agreement (more specifically, ¶ 6 of the

6   Agreement).

7       32.   Indeed, while Elsener has engaged in no conduct that would violate

8   the restrictive covenant contained in ¶ 6, Section C of the Non-Competition

9   Agreement, the covenant itself is invalid and overly broad as to temporal scope,

10   geographic scope, and prohibited business activities.

11       33.   Any purported confidential information that Elsener might have

12   had access to would, at most, only apply to the accounts that she sold or

13   provided services to, and is of limited temporal lifespan such that the covenants

14   contained in the Non-Competition Agreement are overly broad as to geography,

15   scope, and duration, and thus, legally unenforceable.

16       34.   Additionally, since Biosense does not even sell a line of CRM

17   products, it has no confidential information that would support any such

18   restriction against prohibiting Elsener from selling and supporting the sale of

19   CRM devices.

20       35.   As such, no legitimate business interest would support the scope of

21   the restrictions set forth in ¶ 6, Section C of the Non-Competition Agreement,

22   and the provision is therefore unenforceable.

23   ### Elsener Is Not Competing With Biosense

24       36.   As to the restriction in ¶ 7 of the Non-Competition Agreement,

25   Elsener has not sold to or supported the sales of St. Jude's AF products to any

26   Biosense customer to whom she sold or serviced for the one year period prior to

27   her termination with Biosense, and she is not engaged in any other conduct that

28

COMPLAINT

1   would violate *any* legally enforceable provisions of her Non-Competition

2   Agreement.

3        37.   The St. Jude CRM devices and leads that Elsener sells, or intends

4   to sell and service, are different from and do not compete with the AF devices

5   which Elsener serviced and sold for Biosense.

6        38.   Because the St. Jude CRM devices and leads that Elsener will sell

7   or service are very different from, and are not used to treat the same conditions

8   as the Biosense AF devices that she previously supported for Biosense, St.

9   Jude's CRM devices and leads neither "resemble nor compete with" any device

10  sold by Biosense.

11       39.   Furthermore, because the products are not competitive, the

12  activities of Elsener do not, and will not, take business away from Biosense, nor

13  will Elsener's activities provide St. Jude with any sales at Biosense's expense.

14       40.   Nevertheless, Biosense has taken the position that Elsener is

15  violating, or would violate, the restrictive covenants set forth in her Non-

16  Competition Agreement by: i) selling and/or supporting the sale of CRM

17  products for St. Jude in accounts where she used to sell and/or support the sale

18  of AF products for Biosense; ii) selling and/or supporting the sale of CRM

19  products for St. Jude, when Biosense does not make, manufacture, or sell CRM

20  devices; and iii) selling and/or supporting the sale of AF products in accounts

21  where she never sold or serviced product for Biosense (*see supra* at ¶ 2, n. 1).

22                    **The Prior Federal District Court Action**

23       41.   Previously, St. Jude and several former employees of Defendant

24  Biosense sought declaratory relief in the U.S. District Court for the Middle

25  District of Florida, styled *Kissell, et al. v. Biosense Webster, Inc.*, Case No.

26  6:12-cv-01569-JA-TBS (the "Florida Litigation").   A copy of the Complaint

27  from the Florida Litigation is attached hereto as Exhibit "C."

28

                                    COMPLAINT

42.     The Florida Litigation involved the same Biosense Non-Competition Agreement that is at issue in the present action, and the plaintiffs in the Florida Litigation sought the same declaratory relief as requested in the present Complaint, including but not limited to a declaration that: i) the individual plaintiffs were not restricted from selling or rendering services to any account in connection with the sale of any St. Jude CRM device or service; and ii) the individual plaintiffs were not restricted from selling or rendering services to any account outside their former territory for Biosense or any account that they did not sell to or service while at Biosense in connection with the sale of any St. Jude AF device or service. Ex. C at p. 12.

43.     In the Florida Litigation, Biosense filed a counterclaim for breach of contract, breach of duty of loyalty, tortious interference, and declaratory relief.  Biosense simultaneously sought a preliminary injunction from the district court, seeking to, i) enjoin the individual plaintiffs from engaging in conduct that purportedly violated their respective Non-Competition Agreements; and ii) enjoin St. Jude from interfering with those agreements.

44.     On May 28, 2013, the district court denied Biosense's motion for preliminary injunction.  A copy of the district court's order denying Biosense's motion is attached hereto as Exhibit "D."

45.     With respect to paragraph 6 of the Non-Competition Agreements at issue in the Florida Litigation (*i.e.*, the "Confidentiality Clause")—which is, verbatim, the same paragraph 6 from the Non-Competition Agreement at issue in this litigation, *see supra* at paragraph 23—the district court held, "[b]y its express terms, then, the Confidentiality Clause does not flatly prohibit the Sales Representatives from working for a competing company during the post-employment period." Ex. D at p. 5.  The district court further noted that, "[i]nterpreting the [Confidentiality] clause as flatly prohibiting the Sales Representatives [*i.e.*, the individual plaintiffs and former Biosense employees]

1  from working for a competitor would also seem to render Paragraph 7 of the

2  Non-Compete Agreements—which prohibits sales of competing products to

3  certain former customers—a nullity." *Id.* at n. 5.

4      46.   In addition to, and in view of the foregoing contractual

5  interpretation, the district court found that Biosense failed to meet its burden of

6  establishing that the plaintiffs somehow disclosed confidential information that

7  was not generally known to the public in violation of their respective Non-

8  Competition Agreements. *Id.* at pp. 6-8.

9      47.   With respect to paragraph 7 of the Non-Competition Agreements at

10  issue in the Florida Litigation (*i.e.*, the "Goodwill Clause")—which is, verbatim,

11  the same paragraph 7 from the Non-Competition Agreement at issue in this

12  litigation, *see supra* at paragraph 24—the district court held as follows:

> ... the terms of the Goodwill Clause do not flatly prohibit the
> Sales Representatives from working for a competitor or from
> selling products to former customers.  Rather, the Clause
> prohibits the Sales Representatives from selling *competing*
> products to former customers with whom the Sales
> Representatives had contact during the last twelve months of
> their employment with Biosense....

Ex. D at pp. 8-9 (emphasis in original).

## COUNT ONE – DECLARATORY RELIEF

### (28 U.S.C. §§ 2201 2202)

20      48.   Plaintiffs hereby restate the allegations set forth in Paragraphs 1

21  through 47, as if fully set forth herein.

22      49.   The Non-Competition Agreement provides at ¶ 7, Section C, that

23  Elsener, as a former employee, is purportedly restricted only from "directly or

24  indirectly, solicit[ing] any business from, sell[ing] to, or render[ing] any service

25  to any [previous] accounts, customers or clients . . . in connection with the sale

26  of any product or service that resembles or competes with" those products or

27  services sold or supported by Elsener while employed by Biosense.  *See* Non-

28  Competition Agreement at ¶ 7, Section C.

COMPLAINT

50.    In this case, the St. Jude CRM products which Elsener will train on to sell and support the sale of in her former Biosense accounts neither resemble nor compete with any of the Biosense AF products that she formerly serviced and/or sold.

51.    Moreover, Biosense itself does not manufacture, sell or service any CRM products that are the same as, competitive to, or which resemble St. Jude's CRM products.   In fact, Biosense does not manufacture, sell or service any CRM products at all.

52.    Nevertheless an actual and substantial controversy has arisen and exists between the parties as Defendant has taken the position that Elsener's employment by St. Jude, and her sale and support of St. Jude's CRM devices in her former accounts violates, or would violate, valid and legally enforceable obligations contained in her Non-Competition Agreement.

53.    An actual and substantial controversy also exists between the parties as Defendant has taken the position that any sales or support of AF products by Elsener, even outside of her former accounts, would also violate valid and legally enforceable obligations contained in the same Non-Competition Agreement.

54.    However, the Non-Competition Agreement is restricted such that, even if valid in the forum state, it only prohibits the sale of AF products to "…any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment with [Biosense] in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed, or acquired by [Biosense] during the last twelve (12) months of your employment."

55.    And, while Defendant has not directly asserted that Elsener is in possession of, is using, has used or even could use confidential information to the detriment of her former employer, there is nevertheless an actual and

1  substantial controversy given the position taken by Biosense, that its overly

2  broad restrictive covenants may improperly restrict Elsener's legitimate

3  activities on behalf of St. Jude.

4       56.  Elsener has not used or disclosed confidential information in

5  violation of her Non-Competition Agreement, the use or disclosure of which

6  would cause harm to Biosense, or benefit to St. Jude.

7       57.  Based on threats from Biosense, a controversy also exists in that

8  Biosense has taken the position that St. Jude cannot employ, or continue to

9  employ Elsener to: i) sell and/or support the sale of St. Jude's non-competitive

10  CRM devices and leads in her former accounts; ii) sell and/or support the sale of

11  CRM devices and leads for St. Jude, when Biosense does not make,

12  manufacture, or sell CRM devices or leads; or iii) sell and/or support the sale of

13  AF products outside her former accounts, notwithstanding the fact that no valid

14  provision in her Non-Competition Agreement restricts such activities.

15       58.  St. Jude and Elsener are therefore in doubt as to their respective

16  rights and obligations arising from and related to the Non-Competition

17  Agreement and seek a declaration from this Court that: i) Elsener has the legal

18  right to sell and support the sale of St. Jude's non-competitive CRM devices

19  without restriction, including in those former accounts she worked for Biosense;

20  ii) Elsener has the legal right to sell and support the sale of AF devices outside

21  her former Biosense accounts; iii) Elsener's Non-Competition Agreement, and

22  the restrictive covenant contained therein, is overly broad as to duration,

23  geographic scope and as to prohibited business activities and is therefore

24  unenforceable as drafted; iv) St. Jude has the legal right to employ Elsener to

25  sell and support the sale of St. Jude's non-competitive CRM without restriction,

26  including in her former Biosense accounts; and v) St. Jude has the legal right to

27  employ Elsener to sell and support the sale of St. Jude's AF devices outside her

28  former Biosense accounts.

COMPLAINT

59.     St. Jude and Elsener further seek a declaration from this Court that the restrictive covenants of the Non-Competition Agreement violate the applicable laws and public policies of the forum in which the covenants are to be construed, and are therefore invalid and cannot be enforced against Plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request a judicial declaration as follows:

A.     That Elsener is not restricted from, and is allowed to, directly and indirectly, engage in the selling, sale, soliciting the sale of and rendering service to any account whatsoever in connection with the sale of any St. Jude CRM device or service.

B.     That Elsener is not restricted from, and is allowed to, directly and indirectly, engage in the selling, sale, soliciting the sale of and rendering service to any account she did not sell to or service while at Biosense in connection with the sale of any St. Jude AF device or service.

C.     That St. Jude may hire and engage Elsener to directly, and indirectly, engage in selling, soliciting the sale of and rendering service to any account whatsoever in connection with the sale of any St. Jude CRM device or service.

D.     That St. Jude may hire Elsener and permit her to, directly and indirectly, engage in the selling, sale, soliciting the sale of and rendering service to any account she did not sell to or service while at Biosense, in connection with the sale of any St. Jude AF device or service.

E.     That Defendant Biosense may not enforce the Restrictive Covenants contained in the Non-Competition Agreement as drafted.

F.     That Plaintiffs be awarded such other and further relief that the Court may deem just and proper.

COMPLAINT

1  Dated: February 21, 2014       Respectfully submitted,

2

3

4

5  TODD M. MALYNN
   State Bar No. 181595
6  Email: tmalynn@feldmangale.com
   **FELDMAN GALE, P.A.**
7  *Attorneys for Plaintiffs*
   880 West First Street, Suite 315
8  Los Angeles, California 90012
   Telephone: (213) 625-5992
9  Facsimile: (213) 625-5993

10

11  **<u>DEMAND FOR JURY TRIAL</u>**

12  Pursuant to Rule 28 of the Federal Rules of Civil Procedure, Plaintiffs St.

13  Jude Medical S.C., Inc. and Sarah Elsener hereby demand a trial by jury on all

14  issues for which a trial by jury may be had.

15

16  Dated: February 21, 2014       Respectfully submitted,

17

18

19

20  TODD M. MALYNN
   State Bar No. 181595
21  Email: tmalynn@feldmangale.com
   **FELDMAN GALE, P.A.**
22  *Attorneys for Plaintiffs*
   880 West First Street, Suite 315
23  Los Angeles, California 90012
   Telephone: (213) 625-5992
24  Facsimile: (213) 625-5993

25

26

27

28

COMPLAINT

# EXHIBIT A

(To Be Printed on Employing Company Stationery)

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee:   ~SARAH M ELSEVIER~

Residence Address:   ~6501 MONTICELLO De   LINCOLN NE 6570~

### A.  Introduction

Biosense Webster is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below) and training relating to the business of Biosense Webster and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other Johnson & Johnson company.

Because your receipt of CONFIDENTIAL INFORMATION will assist you in performing your work effectively and because the secrecy of CONFIDENTIAL INFORMATION is very important for competitive and other reasons, you are expected to preserve its confidentiality, to refrain from competing with Johnson & Johnson companies while employed by Biosense Webster or any other Johnson & Johnson company, and, with certain limitations, to refrain for eighteen (18) months after your employment ends from competing with any Johnson & Johnson company whose CONFIDENTIAL INFORMATION you had access to during your employment. To formalize these expectations, this Agreement sets forth certain confidentiality, non-competition and non-solicitation obligations you have to Biosense Webster and to any other Johnson & Johnson company by which you may be employed at a later date or to whose CONFIDENTIAL INFORMATION you are given access while employed by Biosense Webster or any other Johnson & Johnson company. This Agreement also defines certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-solicitation of employees and publicity.

### B.  Definitions

As used in this Agreement:

COMPANIES means, collectively Biosense Webster, Johnson & Johnson, and all other entities that are at least 50 percent owned by Johnson & Johnson, either directly or indirectly, and their respective successors and assigns.

COMPANY means any of the COMPANIES.

EMPLOYER means Biosense Webster or, if applicable, any other entity within the COMPANIES by which you are (or were) employed at any time. For purposes of Paragraphs 9, 10, and

January 2009

14 of this Agreement that concern your rights and obligations after you are no longer employed by any COMPANY, EMPLOYER means the COMPANY by which you were last employed.

INVENTIONS means discoveries, improvements and ideas, whether or not patentable, that relate to any work assigned to or performed by you for or on behalf of any COMPANY or to the actual or anticipated research or development or other business activities of any COMPANY.

CONFIDENTIAL INFORMATION means information about the business of any COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by any COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) information that the COMPANY keeps confidential from competitors concerning such things as inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of a COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information; and (b) personal or business information about any COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and is disclosed to you or known by you in connection with your employment by any COMPANY.

COMPETITOR means any person or entity outside the COMPANIES (a) that is engaged in or preparing to become engaged in research, development, production, marketing, selling of or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with an existing or potential product, process, technology, machine, invention, or service of any COMPANY or (b) that could benefit from CONFIDENTIAL INFORMATION.

C.  Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION and company-specific training, your employment or the continuation of your employment with any EMPLOYER, and other benefits being provided to you in connection with this Agreement, you agree as follows:

1   You will disclose promptly to your EMPLOYER or its designee all INVENTIONS conceived or made by you during your employment whether or not during your hours of employment or with the use of any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, any COMPANY. Except as otherwise provided in Paragraphs 19, 20 and 21 of this Agreement, you assign and agree to assign your entire right, title and interest in all INVENTIONS to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2   All works, including, but not limited to, reports, computer programs, drawings, documentation and publications, that you create or prepare during and within the scope of your employment with your EMPLOYER shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER. If any such copyrightable work or portion

2

thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you assign and hereby agree to assign to your EMPLOYER or its designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for and obtain Letters Patent or trademark or copyright registrations to protect the interests of any COMPANY with respect to INVENTIONS, trademarks and copyrightable works conceived, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to any COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines the entity or person for which you wish to work has a diversified business and no portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES. The restrictions of this paragraph will not apply with respect to services you render in California after termination of your employment within the COMPANIES.

7. To avoid disadvantaging your EMPLOYER or any other COMPANY through your use of relationships you gained, maintained, or enhanced through your employment with any COMPANY, you will not, during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8.   Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, solicit or hire on your own behalf, or on behalf of others, any individual employed by any COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANIES. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9.   For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, both at the time you give notice that you will be terminating your employment within the COMPANIES and whenever within the eighteen (18)-month period following the termination of such employment you plan to commence work with a new entity or person of: the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position. During this time period you will also provide such notice as to any planned changes in your work responsibilities. You will provide the notices required under this paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) new responsibilities. You will promptly provide any additional information requested by your EMPLOYER that is reasonably related to the purposes of this paragraph. The information you provide pursuant to this paragraph should not include any confidential information belonging to anyone outside the COMPANIES and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10.   If, after the termination of your employment within the COMPANIES, you are unable to obtain employment consistent with your education and experience in a position in which your Gross Monthly Pay (as defined below, "GMP") is at least equal to your GMP at the time of such termination solely because the restrictions set forth in Paragraphs 6 or 7 of this Agreement, then any such restriction that caused you to be unable to obtain such employment shall bind you only as long as your EMPLOYER, commencing after you provide written notice pursuant to Paragraph 9, makes monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as GMP or (b) the difference between your last GMP at your EMPLOYER and your GMP in any subsequent position. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: your annual base pay, annual commissions, year-end cash bonus, and the monetary value of your year-end stock award (but not any stock option grants, restricted stock units, Certificates of Extra Compensation or other extra compensation, long-term compensation or benefits). Your GMP at your EMPLOYER will be based on the amounts you actually received during the last twelve (12) calendar months you were employed. Your GMP in any subsequent work will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.

11.   To qualify for the payments provided for in Paragraph 10 above for each month that you claim payment is due, you must represent in writing to the Vice President of Human Resources of your EMPLOYER, within fifteen (15) days following the end of the month, that although you diligently sought work consistent with your education and experience, you were unable to attain such employment in a position in which your GMP equaled the GMP you last received from your EMPLOYER, solely because of a restriction set forth in Paragraphs 6 or 7 above. You must also

-4-

promptly submit such further information as your EMPLOYER may request to verify the accuracy of your representation.

12. If your EMPLOYER gives you a written release from the restriction of Paragraphs 6 or 7 above that has been the sole cause of your inability to obtain employment consistent with your education and experience in which your GMP equals at least the GMP you last received from your EMPLOYER, then your EMPLOYER will no longer be obligated to make the payments contemplated by Paragraph 10 above.

13. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any other COMPANY, including any computer equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photograph, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of your EMPLOYER or any other COMPANY that were entrusted to or obtained by you at any time during your employment with any COMPANY

14. You acknowledge that if you violate or are about to violate this Agreement by disclosing or using information prohibited by Paragraph 5 above, by engaging in conduct prohibited by Paragraphs 6, 7, or 8 above, or by failing to turn over property as required by Paragraph 13 above, immediate, irreparable injury to one or more of the COMPANIES will result, warranting (in addition to any other relief) the imposition of injunctive relief against you.

15. Your EMPLOYER may assign this Agreement and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

16. Nothing in this Agreement shall affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

17 This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

20. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or

- 5 -

reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER.

21. The following applies only to a State of Washington employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

22. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of any COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS
AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE.

DATE: 7 15 09

_____
EMPLOYEE

Sarah M Flenner
Name

16211 Monticello Dr
Address

Lincoln NE
City/State


Biosense Webster


DATE: _____

_____
Name:
Title:

-7-

# EXHIBIT B



LAMSON, DUGAN and MURRAY, LLP
ATTORNEYS AT LAW

MICHAEL J. DUGAN (1952-1996)
WILLIAM M LAMSON, JR.
ROBERT J MURRAY
JON S. REID
DANIEL P. CHESIRE
WILLIAM R JOHNSON
FRANK M SCHEPERS
PATRICK C. VIPOND*
MARC E NOVOTNY
DAVID J. SCHMITT*
WILLIAM R. SETTLES
LAWRENCE J. HARR
MATTHEW J. BUCE
KYLE WALLOR
CRAIG F. MARTIN*
ANNE MARIE O'BRIEN
BRIAN J. BRISLEN
SEAN A. MINAHAN*
STACY L. MORRIS*
ANASTASIA WAGNER
DENISE M. DESTACHE
CATHY TRENT-VILLIM
JOHN M WALKER
DANIEL J. WATERS

*ALSO LICENSED IN IOWA

LAMSON, DUGAN and MURRAY BUILDING
10306 REGENCY PARKWAY DRIVE
OMAHA, NEBRASKA, USA 68114-3708

402 397 7300   FAX 402 397 7824   WWW.LDMLAW.COM

MARIA E. LIGHTHALL
SARAH F MACDISSI·
JASON W. GRAMS·
JOANNA S. THOMAS·
DANIEL J. HASSING
SARAH M SMITH
CATHERINE L. FRENCH
DOUGLAS J. AMEN
DAVID A VOORMAN

OF COUNSEL
C.G. BEANEY, JR.
FRANK J. BARRETT
PATRICK W. MEYER

February 6, 2014

Sarah Elsener
6501 Monticello Drive
Lincoln, NE 68510

Dear Ms. Elsener:

Our Firm represents Biosense Webster, Inc. ("BWI"), and we are writing to you because we understand you recently announced your intention to resign from BWI and to begin employment with St. Jude Medical, Inc. ("SJM"), one of BWI's competitors. We are writing to remind you of your continuing obligations to BWI.

You may recall that at the commencement of your employment with BWI you executed the attached Employee Secrecy, Non-Competition and Non-Solicitation (the "Non-Compete Agreement"). The Non-Compete Agreement provides, among other things, that you will not solicit your former BWI customers and that you will not work for a competitor of BWI. Specifically, paragraphs 6 and 7 provide as follows:

6.     Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity

Sarah Elsener
February 6, 2014
Page 2

or person and you each provides written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES.

7    To avoid disadvantaging your EMPLOYER or any other COMPANY through your use of relationships you gained, maintained, or enhanced through your employment with any COMPANY, you will not, during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment.

BWI demands that you comply with these and all other provisions of the Non-Compete Agreement. That means, at a minimum, for the next 18 months you may not call on, sell to or be compensated for the sale of SJM products, including Cardiac Rhythm Management (CRM) and arrhythmias (AFib) related products, to the BWI customers (including the hospitals, doctors, materials management personnel, nurses and all others employed by or who work at the hospitals) you called on for BWI during the last 12 months of your employment with BWI. In order to avoid any misunderstandings, please provide us, by February 21, 2014, with written confirmation that your employment with SJM will conform to the terms set forth above by identifying the SJM products you will promote, the territory for which you will be responsible, your job title and responsibilities and the customers you will service for SJM and confirming that you will comply with the Non-Compete agreement for the full 18 months of its duration.

Additionally, we take this opportunity to remind you of your continuing obligation to maintain the secrecy of BWI's trade secret, proprietary and other confidential information (collectively "Confidential Information"). BWI's Confidential Information includes marketing and sales strategies, product pricing, customer lists, customer purchasing preferences and requirements, sales volumes and other information which the company uses in the operation of its business and which it does not share with the public. Under the terms of the Non-Compete Agreement, you are required not to use, disclose, disseminate or publish any of BWI's Confidential Information. Your failure to comply with these confidentiality obligations would constitute a breach of the Non-Compete Agreement for which BSI would seek redress.

Sarah Elsener
February 6, 2014
Page 3

     BWI takes seriously the enforcement of its Non-Compete Agreements and expects that
you will comply with all your obligations thereunder. BWI's review of this situation and its
determination of whether you have violated the Non-Compete Agreement is continuing and will
be based, in part, on the information you provide in response to this letter. Please be assured that
BWI will pursue all remedies available to it in the event you breach any of your obligations
under the Non-Compete Agreement.

Yours very truly,

LAMSON, DUGAN and MURRAY, LLP

Craig F. Martin
FOR THE FIRM

CFM:dlt/583713

cc:    Jeff Hopkins (w/enclosure)
      Stephanie E. Sowell (w/enclosure)

# EXHIBIT C

FILED

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA   2012 OCT 17 PM 3: 44

ORLANDO DIVISION

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

CASE NO.:   6:12CV1569-ORL-28TBS

DOUGLAS KISSELL, an individual,
WILLIAM LUIS HAMEL, an individual,
ADAM DIETTERICH, an individual,
and ST. JUDE MEDICAL S.C., INC., a
Minnesota corporation,

     Plaintiffs,

vs.

BIOSENSE WEBSTER INC, a California
corporation and a subsidiary of JOHNSON
& JOHNSON, a New Jersey corporation,

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Douglas Kissell, William Luis Hamel and Adam Dietterich (collectively, "Plaintiff Representatives" or "Sales Representatives") and St. Jude Medical S.C., Inc., a Minnesota corporation ("St. Jude"), by and through their undersigned counsel, sue Defendants, Biosense Webster Inc., a California corporation ("Biosense") and Johnson & Johnson, a New Jersey corporation ("J&J") (collectively "Biosense" or "Defendants"), and allege:

### NATURE OF ACTION

1.    This is an action for declaratory relief pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202) and the Florida Declaratory Judgments Act (Fla. Stat. §§ 86.011 et. seq.). Here, the Plaintiffs are seeking to resolve an actual controversy between

1

themselves and the Defendants regarding the rights and obligations of the parties relating to, and arising from, each of Kissell, Hamel and Dietterich's Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreements (Employment Agreements) with their former employer, Biosense.

2.     Specifically, Biosense has taken the position that under a set of identical restrictive covenants contained in each of their respective Employment Agreements, each Plaintiff Representative should be precluded from: i) engaging in the sale of *non-competitive* products in their old sales territories, and ii) engaging in the sale of competitive products *outside* their old sales territories.  Biosense has also taken the position that St. Jude cannot permit the Plaintiff Representatives from engaging in such activity without interfering with the Biosense Agreements.

3.     Defendant Johnson & Johnson has been sued because each of the Employment Agreements arguably also seeks to prevent the Plaintiff Representatives from engaging in competition against any "Company" that is at least 50% owned by Johnson & Johnson, notwithstanding that the Plaintiff Representatives never worked for J&J or any of its other subsidiaries.

## JURISDICTION, PARTIES AND VENUE

4.     This Court has subject matter jurisdiction of this controversy under 28 U.S.C. § 1332 as it is a controversy between citizens of different states having an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

5.     Plaintiff, Douglas Kissell ("Kissell") is an individual citizen and resident of Melbourne, Florida.  Kissell, who previously worked for Biosense, is currently employed by St. Jude as a sales representative.

2

6.    Plaintiff, William Luis Hamel ("Hamel") is an individual citizen and resident of Orlando, Florida. Hamel, who previously worked for Biosense, is currently employed by St. Jude as a sales representative.

7.    Plaintiff, Adam Dietterich ("Dietterich") is an individual citizen and resident of Maitland, Florida. Dietterich, who previously worked for Biosense, is currently employed by St. Jude as a sales representative.

8.    Plaintiff, St. Jude, is a Minnesota corporation with its principal place of business in Austin, Texas.

9.    Defendant, Biosense, is a California corporation with its principal place of business in Diamond Bar, California.

10.    At all times relevant to this action, Biosense has regularly and continuously transacted business in Florida by and through authorized representatives. Biosense also maintains a registered agent in Florida.

11.    Defendant, J&J, is a New Jersey corporation with its principal place of business in New Jersey.

12.    Biosense is a wholly owned subsidiary of J&J. J&J has regularly and continuously transacted business in Florida by and through authorized representatives. Like Biosense, J&J maintains a registered agent in Florida.

13.    Venue properly lies in this Court under 28 U.S.C. § 1391 as a substantial portion of the events giving rise to Plaintiffs' claims occurred in this division of this judicial district and both Biosense and J&J are subject to personal jurisdiction here.

## GENERAL ALLEGATIONS

14.    This dispute centers on whether the Plaintiff Representatives can be legally restricted, pursuant to the overly broad and onerous terms of the restrictive covenants set forth in their respective Employment Agreements, from: i) selling cardiac rhythm management devices for St. Jude, when none of them had ever sold such devices, or competing devices for Biosense; and ii) selling the atrial fibrillation products that they did sell for Biosense, outside of the territories and accounts that they previously serviced for Biosense.

### Arrhythmic Conditions of the Heart

15.    Generally speaking there are many conditions that can affect the ability of the heart to properly "beat" in a controlled and rhythmic fashion to ensure that the proper flow of blood is maintained throughout the body.

16.    Sometimes, depending on the nature of the patient's condition, these arrhythmic disorders can be treated with cardiac rhythm management ("CRM") devices.

17.    CRM devices are relatively small devices that are permanently implanted into the body of a patient to regulate a patient's heartbeat.    CRM devices include implantable pacemakers, implantable defibrillators ("ICD"), and other cardiac resynchronization ("CRT") products.   A pacemaker is used to treat a slow heart rate;   an ICD treats fast heart rates; and a CRT device typically treats certain types of heart failure which may result from either: i) a lack of synchronization between ventricles of the heart or, ii) reduced left ventricle systolic function. All of these devices are connected to the patient's heart via other CRM devices called "lead wires" or "leads."

18.    Other patients, however, may suffer from a different cardiac rhythm disorder, generally known as atrial fibrillation. In atrial fibrillation ("AF"), the upper chambers of the

4

heart "quiver" or "flutter" in a disorganized pattern rather than in a controlled and rhythmic beat, usually as a result of cardiac tissue "misfiring" and sending electrical impulses in a random or disorganized pattern.    This prevents the heart from properly sending blood to the rest of the body.

19.    AF diseases are diagnosed and treated not by CRM devices, but by the use of large expensive pieces of capital equipment, called mapping devices, which are able to diagnose such conditions and identify problem areas of the heart.   Once such a condition has been diagnosed, other types of AF devices, such as radio frequency generators and "ablation catheters" are used to actually burn, or "ablate," the tissue in the heart, in order to assist the heart in establishing a normal rhythm. Ablation works by destroying certain cardiac tissue responsible for causing the heart to beat irregularly and, by destroying such tissue, normal rhythm may then be restored through use of a CRM device.

20.    Unlike CRM devices, AF devices are not implanted into the patient's body. Because AF devices are not implanted, they cannot constantly monitor the heart, and they cannot constantly deliver therapy to the heart.

21.    CRM devices do not treat AF, and AF devices do not treat CRM conditions. CRM and AF devices are not interchangeable, and are not competitive.   Rather, they are very different and treat very different conditions.

## The Companies

22.    St. Jude is a highly innovative company that markets and distributes both CRM and AF devices for use in conjunction with treating various cardiac arrhythmias.

23.    Unlike St. Jude, however, which sells CRM devices as well as AF devices, Biosense does not sell any CRM devices or their related leads.

5

24.   Additionally, no other J&J company, including J&J itself, sells CRM devices.

25.   Instead, Biosense's product line is primarily limited to AF devices, such as mapping devices and ablation catheters.

26.   Because they treat very different conditions in very different ways, St. Jude's CRM devices and leads do not compete with Biosense's AF devices.

### Biosense's Agreements

27.   Previously, Plaintiffs, Kissell, Hamel and Dietterich each were employed by Biosense as sales representatives selling and supporting the sales of Biosense's AF products in certain accounts in the Central Florida area.

28.   As Biosense employees, each was required to sign Biosense's standard Employment Agreement.   Attached hereto as Exs. A-C, respectively, are copies of Kissell, Hamel and Dietterich's Employment Agreements.

29.   Each Agreement states in pertinent part:

> . . . during your employment with any COMPANY and for eighteen (18) months after your last date of employment within the COMPANIES, you will not directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. . .

*See* Employment Agreements, ¶ 6, Section C.

30.   Each Agreement also states:

> . . . during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of his employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed, or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment.

Employment Agreements, ¶ 7, Section C.

### Biosense Wrongly Accuses Kissell, Hamel and Dietterich of Violating Their Employment Agreements

31.     Earlier this year, each of the Plaintiff's Representatives resigned from Biosense to work for St. Jude as CRM Sales Representatives.

32.     As St. Jude CRM Representatives each has limited his activities to either: i) the sale and support of St. Jude's *non-competitive* CRM devices and leads to accounts that they may have had contact with while at Biosense, or ii) the sale of competitive AF devices to customers and potential customers of St. Jude with whom they did *not* have any contact or to whom they did not sell AF products while associated with Biosense.

33.     As a result, each has fully complied with any legally enforceable restrictions set forth in their respective Employment Agreement, including those set forth in the above-quoted ¶ ¶ 6 and 7 of Section C.

34.     Nevertheless, Biosense and J&J have taken the position that the Plaintiff Representatives are violating their Employment Agreements by now working for St. Jude.

### Kissell, Hamel and Dietterich Are Not Using Confidential Information

35.     None of the Sales Representatives have used or disclosed any confidential information in violation of the Employment Agreements, more specifically at ¶ 6, and none are in a position to disadvantage Biosense or benefit St. Jude through the use or disclosure of any confidential information, in the event such confidential information even exists.

36.     Indeed, while the Sales Representatives have engaged in no conduct that would violate the restrictive covenant contained in ¶ 6, Section C, the covenant itself is overly broad as to temporal scope, geographic scope and prohibited business activities.

7

37.   Any even arguably confidential information that each might have had access to is only applicable to the accounts that the Plaintiff Representatives sold to, and is of limited lifespan such that the covenants contained in the Employment Agreements are overly broad and legally unenforceable.

38.   Even more, since Biosense does not even sell a line of CRM products, it has no confidential information that would support any such restriction against employing Kissell, Hamel and Dietterich to sell and support the sale of CRM devices.

39.   As such, no legitimate business interest would support the scope of the restrictions set forth in ¶ 6, Section C and the provision is therefore unenforceable.

### Kissell, Hamel and Dietterich Are Not Competing With Biosense

40.   As to the restriction in ¶ 7, none of the Sales Representatives are engaged in selling or supporting the sales of St. Jude's AF line of products to their former Biosense customers, and none are engaged in any other conduct that would violate any of the potentially legally enforceable provisions of the Employment Agreements.

41.   The St. Jude CRM devices and leads that each Plaintiff Representative currently sells and supports do not and cannot treat atrial fibrillation, the cardiac condition treated by those different AF devices which each sold for Biosense.

42.   Because the St. Jude CRM devices and leads that each now sells are very different from, and are not be used to treat the same conditions as, the Biosense AF devices that each previously sold, St. Jude's CRM devices and leads neither resemble nor compete with any device sold by Biosense.

43.   Furthermore, because the products do not compete, the activities by the Sales Representatives do not take business away from Biosense, or provide St. Jude with any sales at the expense of Biosense.

44.   Nevertheless, Biosense and J&J have taken the position that Kissell, Hamel and Dietterich are each violating the restrictive covenants set forth in their Employment Agreements by: i) selling CRM products for St. Jude in territories where each used to sell AF products for Biosense, and ii) selling AF products in territories and accounts where they never sold product for Biosense.

## COUNT ONE – DECLARATORY RELIEF

45.   The Plaintiffs hereby restate the allegations set forth in Paragraphs 1 through 44, as if fully set forth herein.

46.   As set forth above, Kissell, Hamel and Dietterich, even under the terms of the overly broad restrictive covenants contained in the Employment Agreements, would be precluded from employment by a competitor only where each has actual confidential information, the use or disclosure of which could harm Biosense or advantage St. Jude. *See* Employment Agreements at ¶ 6, Section C.

47.   Here, none of the Sales Representatives have used or disclosed confidential information in violation of the Employment Agreements or even possess confidential information, the use of which would cause harm to Biosense or benefit to St. Jude.

48.   Furthermore, the Employment Agreements each provide at ¶ 7, Section C, that the former employees Kissell, Hamel and Dietterich are restricted only from "directly or indirectly, solicit[ing] any business from, sell[ing] to, or render[ing] any service to any [previous] accounts, customers or clients . . . in connection with the sale of any product or

service that resembles or competes with" those products or services sold by Kissell, Hamel and Dietterich while employed by Biosense. *See* Employment Agreements at ¶ 7, Section C.

49.   Here, the St. Jude CRM products which the Plaintiff's Representatives are now selling in their former territories neither resemble nor compete with, any of the Biosense AF products that the Plaintiff's Representatives formerly sold.

50.   Nevertheless an actual and substantial controversy has arisen and exists between the parties as the Defendants have taken the position that Kissell, Hamel and Dietterich's employment by St. Jude, and their sale and support of St. Jude's CRM devices and services in their former territories violates the obligations contained in their respective Employment Agreements.

51.   An actual and substantial controversy also exists between the parties as the Defendants have taken the position that Kissell, Hamel and Dietterich's sales of AF products outside of their former territories also violates the obligations contained in the same Employment Agreements.

52.   And, while the Defendants have not directly asserted that Kissell, Hamel and Dietterich are in possession of, are using, have used or even could use confidential information to the detriment of their former employer, there is nevertheless an actual and substantial controversy given the position taken by Biosense that its overly broad restrictive covenants are fully enforceable against the Sales Representatives' current activities on behalf of St. Jude.

53.   Kissell, Hamel and Dietterich are therefore each concerned, and each has reason to believe, that Biosense will attempt to prevent them from working for St. Jude in their chosen profession to sell and support the sale of St. Jude's CRM devices and leads without restriction and to sell and support the sale of St. Jude's AF devices outside of their former territories,

notwithstanding the fact that no valid provision in their respective Employment Agreements restricts such activities.

54.   Based on threats from Biosense, a controversy also exists in that Biosense has taken the position that St. Jude cannot employ, or continuing to employ, Kissell, Hamel and Dietterich to: i) sell or support the sale of St. Jude's non-competitive CRM devices and leads in their former territories, or ii) sell AF products outside their former territories.

55.   St. Jude, Kissell, Hamel and Dietterich are therefore in doubt as to their respective rights and obligations arising from and related to the Employment Agreements and seek a declaration from this Court that:   i) Kissell, Hamel and Dietterich have the legal right to sell and support the sale of St. Jude's non-competitive CRM devices in their former territories for Biosense;  ii) Kissell, Hamel and Dietterich have the legal right to sell and support the sale of AF devices outside their former territories and accounts for Biosense; iii) Kissell, Hamel and Dieterrich's Employment Agreements, and the restrictive covenants contained therein, are overly broad as to duration, geographic scope and as to prohibited business activities and are therefore unenforceable as drafted; iv) St. Jude has the legal right to employ Kissell, Hamel and Dietterich to sell and support the sale of St. Jude's non-competitive CRM devices in their former territories for Biosense; and v) St. Jude has the legal right to employ Kissell, Hamel and Dietterich to sell and support the sale of St. Jude's AF devices outside their former territories and to different accounts than those they serviced for Biosense.

## REQUEST FOR RELIEF

Based upon the above and foregoing, the Plaintiffs, St. Jude and the Plaintiff's Representatives, Kissell, Hamel and Dietterich, request a judicial declaration:

A.   That Kissell, Hamel and Dietterich are not restricted from, and are allowed to, directly and indirectly, engage in the selling, sale, soliciting the sale of and rendering service to any account whatsoever in connection with the sale of any St. Jude CRM device or service;

B.   That Kissell, Hamel and Dietterich are not restricted from, and are allowed to, directly and indirectly, engage in the selling, sale, soliciting the sale of and rendering service to any account outside their former territory for Biosense or any account they did not sell to or service while at Biosense in connection with the sale of any St. Jude AF device or service;

C.   That St. Jude may hire and engage the Plaintiff Representatives, Kissell, Hamel and Dietterich to, directly and indirectly, engage in selling, soliciting the sale of and rendering service to any account whatsoever in connection with the sale of any St. Jude CRM device or service;

D.   That St. Jude may hire Kissell, Hamel and Dietterich and permit them to, directly and indirectly, engage in the selling, sale, soliciting the sale of and rendering service to any account outside their former territory for Biosense, or any account they did not sell to or service while at Biosense, in connection with the sale of any St. Jude AF device or service;

E.   That the Defendants, Biosense and J&J, may not enforce the Restrictive Covenants contained in the Employment Agreements as drafted, and,

F.   For any further relief that this Court deems warranted and justified.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable as a matter of right.

DATED: October 17, 2012

Respectfully submitted,

Feldman Gale, P.A.
One Biscayne Tower, 30th Floor
2 South Biscayne Boulevard
Miami, Florida 33131-4332
Telephone: 305-358-5001
Facsimile: 305-358-3309

By: _____
James A. Gale/ 371726
JGale@FeldmanGale.com
Christopher P. Demetriades/ 112917
GMetzger@FeldmanGale.com
Alejandro J. Fernandez/ 032221
AFernandez@FeldmanGale.com

13

# Ex. A

[To be printed on employing Company Stationery]

**EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION
AND NON-SOLICITATION AGREEMENT**

Name of Employee:        Douglas Getz II

Residence Address:        925 East Willmire Drive, Melbourne FL 32935

**A.   Introduction**

Biosense Webster Inc. is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below) and training relating to the business of Biosense Webster Inc. and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other Johnson & Johnson company.

Because your receipt of CONFIDENTIAL INFORMATION will assist you in performing your work effectively and because the secrecy of CONFIDENTIAL INFORMATION is very important for competitive and other reasons, you are expected to preserve its confidentiality, to remain in the competitive with Johnson & Johnson companies while employed by Biosense Webster Inc. or any other Johnson & Johnson company, and, with certain limitations, to refrain for eighteen (18) months after your employment ends from competing with any Johnson & Johnson company whose CONFIDENTIAL INFORMATION you had access to during your employment. To formalize these expectations, this Agreement sets forth certain confidentiality, non-competition and non-solicitation obligations you have to Biosense Webster Inc. and to any other Johnson & Johnson company by which you may be employed at any time, date or to whose CONFIDENTIAL INFORMATION you are given access while employed by Biosense Webster Inc. or any other Johnson & Johnson company. This Agreement also defines certain rights and obligations concerning intellectual property, non-solicitation of business, non-solicitation of employees and publicity.

**B.   Definitions**

As used in this Agreement:

COMPANIES means, collectively Biosense Webster, Inc., Johnson & Johnson, and all other entities that are at least 50 percent owned by Johnson & Johnson, either directly or indirectly, and their respective successors and assigns.

COMPANY means any of the COMPANIES.

EMPLOYER means Biosense Webster Inc. or, if applicable, any other entity within the COMPANIES by which you are (or were) employed at any time. For purposes of Paragraphs 9, 10, and

January 2009

th of this Agreement that concern your rights and obligations after you are no longer employed by any COMPANY. EMPLOYER means the COMPANY by which you were last employed.

INVENTIONS means discoveries, improvements and ideas, whether or not patentable, that relate to any work assigned to or performed by you for or on behalf of any COMPANY or to the actual or anticipated research or development or other business activities of any COMPANY.

CONFIDENTIAL INFORMATION means information about the business of any COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by any COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) information that the COMPANY keeps confidential from competitors, concerning such things as inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of a COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer- or client-specific information; and (b) personal or business information about any COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and is disclosed to you or known by you in connection with your employment by any COMPANY.

COMPETITOR means any person or entity outside the COMPANIES (a) that is engaged in or preparing to become engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service, in existence or under development that resembles or competes with an existing or potential product, process, technology, machine, invention, or service of any COMPANY, or (b) that would benefit from CONFIDENTIAL INFORMATION.

**C   Rights and Obligations**

In consideration of your receipt of CONFIDENTIAL INFORMATION and company-specific training, your employment or the continuation of your employment with any EMPLOYER, and other benefits being provided to you in connection with this Agreement, you agree as follows:

1.   You will disclose promptly to your EMPLOYER or its designee all INVENTIONS conceived or made by you during your employment, whether or not during your hours of employment or with the use of any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of any COMPANY or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for or on behalf of any COMPANY. Except as otherwise provided in Paragraphs 18, 20 and 25 of this Agreement, you covenant and agree to assign your entire right, title and interest in all INVENTIONS to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER, unless such INVENTIONS are identified and attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2.   All works, including, but not limited to, reports, computer programs, drawings, documentation and publications, that you create or prepare during and within the scope of your employment with your EMPLOYER shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER. If any such copyrightable work or portion

thereof shall not legally qualify as a work made for hire, or shall consequently be held not to be a work made for hire, you assign and hereby agree to assign to your EMPLOYER or its designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3.  You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for and obtain Letters Patent or trademark or copyright registrations to protect the interests of any COMPANY with respect to INVENTIONS, trademarks and copyrightable works conceived, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4.  You will not use or disclose to any COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete, covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5.  Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6.  Excepting provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPANY or advantage the COMPETITOR in your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determine that the entity or person for which you wish to work is not diversified business and the portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES. The restrictions of this paragraph will not apply with respect to services you render in California after termination of your employment within the COMPANIES.

7.  To avoid disadvantaging your EMPLOYER or any other COMPANY through your use of relationships you gained, maintained, or enhanced through your employment with any COMPANY, you will not, during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES, in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

-5-

8. Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, solicit or hire on your own behalf, or on behalf of others, any individual employed by any COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANIES. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or the services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9. For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, both at the time you give notice that you will be terminating your employment within the COMPANIES and whenever within the eighteen (18)-month period following the termination of such employment you plan to commence work with a new entity or person of the identity of each entity or person for which you will be working your new title, and the responsibilities of the position. During this time period you will also provide such notice as to any planned changes in your work responsibilities. You will provide the notices required under this paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event at least two (2) weeks prior to commencing any new position or (if applicable) new responsibilities. You will promptly provide any additional information requested by your EMPLOYER that is reasonably related to the purposes of this paragraph. The information you provide pursuant to this paragraph should not include any confidential information belonging to anyone outside the COMPANIES and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If, after the termination of your employment within the COMPANIES, you are unable to obtain employment consistent with your education and experience in a position in which your Gross Monthly Pay (as defined below, "GMP") is at least equal to your GMP at the time of such termination solely because the restrictions set forth in Paragraphs 6 or 7 of this Agreement, then any such restriction that caused you to be unable to obtain such employment shall bind you only as long as your EMPLOYER, commencing after you provide written notice pursuant to Paragraph 9, makes monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as GMP or (b) the difference between your last GMP at your EMPLOYER and your GMP in any subsequent position. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: your annual base pay, annual commissions, year-end cash bonus, and the monetary value of your year-end stock award (but not any stock option grants, restricted stock units, Certificate of Extra Compensation or other extra compensation, long-term compensation or benefits). Your GMP at your EMPLOYER will be based on the amounts you actually received during the last twelve (12) calendar months you were employed. Your GMP in any subsequent work will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.

11. To qualify for the payments provided for in Paragraph 10 above for each month that you claim payment is due, you must represent in writing to the Vice President of Human Resources of your EMPLOYER, within fifteen (15) days following the end of the month, that although you diligently sought work consistent with your education and experience, you were unable to obtain such employment in a position in which your GMP equaled the GMP you last received from your EMPLOYER, solely because of a restriction set forth in Paragraphs 6 or 7 above. You must also

-A-

promptly submit such further information as your EMPLOYER may request to verify the accuracy of your representation.

12. If your EMPLOYER gives you a written release from the restriction of Paragraphs 6 or 7 above that may be due to the sole cause of your inability to obtain employment consistent with your education and experience, in which your GMF equals at least the GMF you last received from your EMPLOYER, then your EMPLOYER will no longer be obligated to make the payments contemplated by Paragraph 10 above.

13. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or control belonging to your EMPLOYER or any other COMPANY, including any computer equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of your EMPLOYER or any other COMPANY that were entrusted to or obtained by you at any time during your employment with any COMPANY.

14. You acknowledge that, if you violate or are about to violate this Agreement by disclosing or using information prohibited by Paragraph 5 above, by engaging in conduct prohibited by Paragraphs 6, 7 or 8 above, or by failing to turn over property as required by Paragraph 13 above, immediate irreparable injury to one or more of the COMPANIES will result, warranting (in addition to any other relief) the imposition of injunctive relief against you.

15. Your EMPLOYER may assign this Agreement and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

16. Nothing in this Agreement shall affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

17. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalid or unenforceable under applicable law, this shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

20. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or

reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (iii) the INVENTION results from any work performed by you for your EMPLOYER.

21. The following subparagraphs shall be effective unless Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used, and that was developed entirely on your own time, unless (a) the INVENTION relates, at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (iii) the INVENTION results from any work performed by you for your EMPLOYER.

22. Nothing contained in this Agreement shall be deemed to confer on you any right with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of your duties and of the duration of the notice period. During any such period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of any COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

-6-

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS
AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE.

DATE: 2 September 2009

Douglas Kissell
EMPLOYEE

Name:

937 East Wiltshire Drive
Address:

Melbourne, FL 32935
City/State:

Blackout Webster Inc.

DATE: _____

Name:
Title:

Ex. B

Johnson&Johnson

Biosense Webster
a Johnson&Johnson company

**EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

Name of Employee: _Jonathan Lee Bines_

Residence Address: _1702 Timber St. 105  Orlando FL  32814_

**A.  Introduction**

Biosense Webster Inc. is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below) and training relating to the business of Biosense Webster Inc. and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") IS applicable to any employment you may subsequently have with any other Johnson & Johnson company.

Because your receipt of CONFIDENTIAL INFORMATION will assist you in performing your work effectively and because the secrecy of CONFIDENTIAL INFORMATION is very important for competitive and other reasons, you are expected to preserve its confidentiality, to refrain from competing with Johnson & Johnson companies while employed by Biosense Webster Inc or any other Johnson & Johnson company, and, with certain limitations, to refrain for eighteen (18) months after your employment ends from competing with any Johnson & Johnson company whose CONFIDENTIAL INFORMATION you had access to during your employment. To formalize these expectations, this Agreement sets forth certain confidentiality, non-competition and non-solicitation obligations you have to Biosense Webster Inc and to any other Johnson & Johnson company by which you may be employed at a later date or to whose CONFIDENTIAL INFORMATION you are given access while employed by Biosense Webster Inc or any other Johnson & Johnson company. This Agreement also defines certain rights and obligations concerning intellectual property, non-solicitation of business, non-solicitation of employees, and publicity.

**B.  Definitions**

As used in this Agreement:

COMPANIES means, collectively, Biosense Webster Inc, Johnson & Johnson, and all other entities that are at least 50 percent owned by Johnson & Johnson, either directly or indirectly, and their respective successors and assigns.

COMPANY means any of the COMPANIES.

EMPLOYER means Biosense Webster Inc or, if applicable, any other entity within the COMPANIES by which you are (or were) employed at any time. For purposes of Paragraphs 9, 10, and

September 2008

11 of this Agreement that contain your rights and obligations after you are no longer employed by any COMPANY. EMPLOYER means the COMPANY by which you were last employed.

INVENTIONS means discoveries, improvements and ideas, whether or not patentable, that relate to the work assigned to or performed by you for or on behalf of any COMPANY or to the actual or anticipated research or development or other business or any COMPANY.

CONFIDENTIAL INFORMATION means information about the business of any COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by any COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) information that the COMPANY keeps confidential from competitors concerning such things as inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of a COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information and (b) personnel or business information about any COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and is disclosed to you or known by you in connection with your employment by any COMPANY.

COMPETITOR means any person or entity outside the COMPANIES (a) that is engaged in or preparing to become engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that, resembles or competes with an existing or potential product, process, technology, machine, invention, or service of any COMPANY or (b) that could benefit from CONFIDENTIAL INFORMATION.

## C. Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION and company-specific training, your employment on the continuation of your employment with any EMPLOYER, and other benefits being provided to you in connection with this Agreement, you agree as follows:

1. You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived or made by you during your employment whether or not during your hours of employment or with the use of any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, on or behalf of, any COMPANY. Except as otherwise provided in Paragraphs 19, 20 and 21 of this Agreement, you assign and agree to assign your entire right, title and interest, in all INVENTIONS to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER, unless such INVENTIONS are identifications shown attached hereto, and signed by you and by your EMPLOYER as of the date of this Agreement.

2. All works, including but not limited to reports, computer programs, drawings, documentation and publications, that you create or prepare during and within the scope of your employment with your EMPLOYER shall be considered works made for hire, and the worldwide copyrights therein shall

- 2 -

be the sole and exclusive property of your EMPLOYER. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you assign and hereby agree to assign to your EMPLOYER, or its designee, all your right, title and interest therein. You agree to promptly disclose, all such works to your EMPLOYER.

You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for and obtain Letters Patent or trademark or copyright registrations to protect the interests of any COMPANY with respect to INVENTIONS, trademarks and copyrightable works conceived, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4.    You will not use or disclose to any COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5.    Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6.    Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, and entity or person and you each provide written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES. The restrictions of this paragraph will not apply with respect to services you render in California after termination of your employment within the COMPANIES.

7.    To avoid disadvantaging your EMPLOYER or any other COMPANY through your use of relationships you gained, maintained, or enhanced through your employment with any COMPANY, you will not, during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES, in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES, or to services you render in California after termination of

-3-

your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8.   Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, solicit or hire on your own behalf, or on behalf of others, any individual employed by any COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANIES. This restriction of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9.   For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, both at the time you give notice that you will be terminating your employment within the COMPANIES and whenever within the eighteen (18) month period following the termination of such employment you plan to commence work with a new entity or person of the identity of each entity or person for which your will be working, your new title, and the responsibilities of the position. During this time period you will also provide such notice as to any planned changes in your work responsibilities. You will provide the notices required under this paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or of applicable new responsibilities. You will promptly provide any additional information requested by your EMPLOYER that is reasonably related to the purposes of this paragraph. The information you provide pursuant to this paragraph should not include any confidential information belonging to anyone outside the COMPANIES and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10.   If, after the termination of your employment within the COMPANIES, you are unable to obtain employment consistent with your education and experience in a position in which your Gross Monthly Pay (as defined below, "GMP") is at least equal to your GMP at the time of such termination solely because the restrictions set forth in Paragraphs 6 or 7 of this Agreement, then any such restriction that caused you to be unable to obtain such employment shall bind you only as long as your EMPLOYER, commencing after you provide written notice pursuant to Paragraph 9, makes monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as GMP or (b) the difference between your last GMP at your EMPLOYER and your GMP in any subsequent position. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: your annual base pay, annual commissions, year-end cash bonus, and the monetary value of your year-end stock award (but not any stock option grants, restricted stock units, Certificates of Extra Compensation or other extra compensation, long-term compensation or benefits). Your GMP at your EMPLOYER will be based on the amounts you actually received during the last twelve (12) calendar months you were employed. Your GMP in any subsequent work will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.

11.   To qualify for the payments provided for in Paragraph 10 above, for each month, that you claim payment is due, you must represent in writing to the Vice President of Human Resources of your EMPLOYER, within fifteen (15) days following the end of the month, that although you diligently sought work consistent with your education and experience, you were unable to attain such employment in a position in which your GMP equaled the GMP you last received from your

EMPLOYER, solely because of a restriction set forth in Paragraphs 6 or 7 above. You must also promptly submit such further information as your EMPLOYER may request to verify the accuracy of your representation.

12. If your EMPLOYER gives you a written release from the restriction of Paragraphs 6 or 7 above that has been the sole cause of your inability to obtain employment consistent with your education and experience in which your GMP equals at least the GMP you last received, from your EMPLOYER, then your EMPLOYER will no longer be obligated to make the payments contemplated by Paragraph 10 above.

13. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any other COMPANY, including any computer equipment. You shall not retain copies of any correspondence, membranda, reports, notebooks, drawings, photograph, or other documents in any form whatsoever including information contained in computer memory or on any computer disk. [...] of PUBLIC or not any [...] the use [...] of [...] is [...] at any time about your employment or the [...]

14. You acknowledge that if you violate or are about to violate this Agreement by disclosing or using information prohibited by Paragraph 5 above, by engaging in conduct prohibited by Paragraphs 6, 7, or 8 above, or by failing to turn over property as required by Paragraph 13 above, immediate irreparable injury to one or more of the COMPANIES will result, warranting (in addition to any other relief) the imposition of injunctive relief against you.

15. Your EMPLOYER may assign this Agreement, and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

16. Nothing in this Agreement shall affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

17. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to the conflict of law rules. Any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject-matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment supplies, facility, or trade secret information of any COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

20. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed

-5-

entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

21. The following applies only to a State of Washington employees: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (i) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (a) directly to the business of your EMPLOYER, or (b) to your EMPLOYER's actual or demonstrably anticipated research or development, and (ii) the INVENTION results from any work performed by you for your EMPLOYER.

22. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the termination of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of any COMPANY addressing the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS
AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE.

DATE: _____   _____
                        EMPLOYEE'S SIGNATURE

                        _____
                        Name

                        _____
                        Address

                        _____
                        City/State

                        Riverside Webster Inc.

DATE: _____   _____
                        Name:
                        Title:

Ex. C

Mar 02, 10 09:04a    Arrhythmia consult                          3219726975                    p.3

(To Be Printed on Employing Company Stationery)

### EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee:    Adam Dietterich

Residence Address:    3247 Worthington Rd, Maitland, Fl 32751

**A. Introduction**

Biosense Webster Inc. is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below) and training relating to the business of Biosense Webster Inc. and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other Johnson & Johnson company.

Because your receipt of CONFIDENTIAL INFORMATION will assist you in performing your work effectively and because the secrecy of CONFIDENTIAL INFORMATION is very important for competitive and other reasons, you are expected to preserve its confidentiality, to refrain from competing with Johnson & Johnson companies while employed by Biosense Webster Inc. or any other Johnson & Johnson company, and, with certain limitations, to refrain for eighteen (18) months after your employment ends from competing with any Johnson & Johnson company whose CONFIDENTIAL INFORMATION you had access to during your employment. To formalize these expectations, this Agreement sets forth certain confidentiality, non-competition and non-solicitation obligations you have to Biosense Webster Inc. and to any other Johnson & Johnson company by which you may be employed at a later date or to whose CONFIDENTIAL INFORMATION you are given access while employed by Biosense Webster Inc. or any other Johnson & Johnson company. This Agreement also defines certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-solicitation of employees and publicity.

**B. Definitions**

As used in this Agreement:

COMPANIES means, collectively Biosense Webster Inc., Johnson & Johnson, and all other entities that are at least 50 percent owned by Johnson & Johnson, either directly or indirectly, and their respective successors and assigns.

COMPANY means any of the COMPANIES.

EMPLOYER means Biosense Webster Inc. or, if applicable, any other entity within the COMPANIES by which you are (or were) employed at any time. For purposes of Paragraphs 9, 10, and

September 2009

11 of this Agreement that concern your rights and obligations after you are no longer employed by any COMPANY, EMPLOYER means the COMPANY by which you were last employed.

INVENTIONS means discoveries, improvements and ideas, whether or not patentable, that relate to any work assigned to or performed by you for or on behalf of any COMPANY or to the actual or anticipated research or development or other business activities of any COMPANY.

CONFIDENTIAL INFORMATION means information about the business of any COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by any COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) information that the COMPANY keeps confidential from competitors concerning such things as inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of a COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information; and (b) personal or business information about any COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and is disclosed to you or known by you in connection with your employment by any COMPANY.

COMPETITOR means any person or entity outside the COMPANIES (a) that is engaged in or preparing to become engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with an existing or potential product, process, technology, machine, invention, or service of any COMPANY or (b) that could benefit from CONFIDENTIAL INFORMATION.

C.  Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION and company-specific training, your employment or the continuation of your employment with any EMPLOYER, and other benefits being provided to you in connection with this Agreement, you agree as follows:

1.  You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived or made by you during your employment whether or not during your hours of employment or with the use of any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, any COMPANY. Except as otherwise provided in Paragraphs 19, 20 and 21 of this Agreement, you assign and agree to assign your entire right, title and interest in all INVENTIONS to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2.  All works, including, but not limited to, reports, computer programs, drawings, documentation and publications, that you create or prepare during and within the scope of your employment with your EMPLOYER shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a

- 2 -

Mar 02 10 09:05a   Arrhythmia consult                    3219726975        p.5

work made for hire, you assign and hereby agree to assign to your EMPLOYER or its designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for and obtain Letters Patent or trademark or copyright registrations to protect the interests of any COMPANY with respect to INVENTIONS, trademarks and copyrightable works conceived, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to any COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES. The restrictions of this paragraph will not apply with respect to services you render in California after termination of your employment within the COMPANIES.

7. To avoid disadvantaging your EMPLOYER or any other COMPANY through your use of relationships you gained, maintained, or enhanced through your employment with any COMPANY, you will not, during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8. Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, solicit or hire on your own behalf, or on behalf of others, any individual employed by any

- 3 -

Mar 02 10 09:05a        Arrhythmia consult                          3219726976                      p.6

COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANIES. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9.  For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, both at the time you give notice that you will be terminating your employment within the COMPANIES and whenever within the eighteen (18)-month period following the termination of such employment you plan to commence work with a new entity or person or the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position. During this time period you will also provide such notice as to any planned changes in your work responsibilities. You will provide the notices required under this paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) new responsibilities. You will promptly provide any additional information requested by your EMPLOYER that is reasonably related to the purposes of this paragraph. The information you provide pursuant to this paragraph should not include any confidential information belonging to anyone outside the COMPANIES and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10.  If, after the termination of your employment within the COMPANIES, you are unable to obtain employment consistent with your education and experience in a position in which your Gross Monthly Pay (as defined below, "GMP") is at least equal to your GMP at the time of such termination solely because the restrictions set forth in Paragraphs 6 or 7 of this Agreement, then any such restriction that caused you to be unable to obtain such employment shall bind you only as long as your EMPLOYER, commencing after you provide written notice pursuant to Paragraph 9, makes monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as GMP or (b) the difference between your last GMP at your EMPLOYER and your GMP in any subsequent position. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: your annual base pay, annual commissions, year-end cash bonus, and the monetary value of your year-end stock award (but not any stock option grants, restricted stock units, Certificates of Extra Compensation or other extra compensation, long-term compensation or benefits). Your GMP at your EMPLOYER will be based on the amounts you actually received during the last twelve (12) calendar months you were employed. Your GMP in any subsequent work will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.

11.  To qualify for the payments provided for in Paragraph 10 above for each month that you claim payment is due, you must represent in writing to the Vice President of Human Resources of your EMPLOYER, within fifteen (15) days following the end of the month, that although you diligently sought work consistent with your education and experience, you were unable to attain such employment in a position in which your GMP equaled the GMP you last received from your EMPLOYER, solely because of a restriction set forth in Paragraphs 6 or 7 above. You must also promptly submit such further information as your EMPLOYER may request to verify the accuracy of your representation.

12.  If your EMPLOYER gives you a written release from the restriction of Paragraphs 6 or 7 above that has been the sole cause of your inability to obtain employment consistent with your education and experience in which your GMP equals at least the GMP you last received from your EMPLOYER,

- 4 -

Mar 02 10 09:06a     Arrhythmia consult                    3219726975              p.7

then your EMPLOYER will no longer be obligated to make the payments contemplated by Paragraph 10 above.

13. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any other COMPANY, including any computer equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photograph, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of your EMPLOYER or any other COMPANY that were entrusted to or obtained by you at any time during your employment with any COMPANY.

14. You acknowledge that if you violate or are about to violate this Agreement by disclosing or using information prohibited by Paragraph 5 above, by engaging in conduct prohibited by Paragraphs 6, 7 or 8 above, or by failing to turn over property as required by Paragraph 13 above, immediate irreparable injury to one or more of the COMPANIES will result, warranting (in addition to any other relief) the imposition of injunctive relief against you.

15. Your EMPLOYER may assign this Agreement and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

16. Nothing in this Agreement shall affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

17. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

20. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

- 5 -

Mar 02 10 09:06e    Arrhythmia consult                    3219726975              p.8

21. The following applies only to a State of Washington employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

22. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of any COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE.

DATE: 3/2/10

EMPLOYEE'S SIGNATURE

Adam Dietterich
Name

2347 Worthington Rd
Address

Mailland Fl 32751
City/State

Biosense Webster Inc.

DATE: _____

Name: _____
Title: _____

- 6 -

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Kissell, Douglas; Hamel, William L.; Dietlerich, Adam; and St. Jude Medical S.C., Inc. | Biosense Webster, Inc. and Johnson & Johnson |

**(b)** County of Residence of First Listed Plaintiff   Brevard County, Fla.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Los Angeles County, Cal.
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Feldman Gale, P.A., 2 S. Biscayne Blvd., 30th Floor, Miami, Fla. 33131
James A. Gale, Christopher Dewhirst and Alejandro J. Fernandez

Attorneys *(If Known)*

| II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)* | III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)* |
|---|---|
| | *(For Diversity Cases Only)* and One Box for Defendant) |

| II. BASIS OF JURISDICTION | | III. CITIZENSHIP OF PRINCIPAL PARTIES | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* | Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district *(specify)*   ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**   Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. s. 1332

Brief description of cause:
Complaint for Declaratory Relief

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE                 DOCKET NUMBER

DATE   10/17/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE

# EXHIBIT D

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DOUGLAS KISSELL, WILLIAM LUIS
HAMEL, ADAM DIETTERICH, and ST.
JUDE MEDICAL S.C., INC.,

            Plaintiffs,

v.                                                       Case No: 6:12-cv-1569-Orl-28TBS

BIOSENSE WEBSTER, INC.,

            Defendant.
_____/

ORDER

This case is before the Court on Biosense Webster, Inc.'s Motion for Preliminary

Injunction.[1]  Biosense seeks to enjoin three of its former sales representatives from

engaging in conduct that it claims violates non-competition agreements it has with them.

Biosense also seeks to enjoin St. Jude from interfering with those agreements.

Because Biosense has not presented sufficient evidence to establish a likelihood of

success on the merits, its motion must be DENIED.

I.      Background

Biosense and St. Jude each sell medical products that electrophysiologists use

to treat heart arrhythmias.  Both Biosense and St. Jude sell a range of non-implantable

diagnostic and therapeutic products used to treat arrhythmias through surgical ablation

procedures ("AFib products").    Unlike Biosense, however, St. Jude also sells

---

[1] The relevant filings before the Court are Biosense's Motion for Preliminary
Injunction (Doc. 9), Plaintiffs' Response (Doc. 28), and Biosense's Reply (Doc. 35). The
Court heard oral argument on Biosense's motion on April 18, 2013.

implantable cardiac rhythm management devices ("CRM products") such as pacemakers and defibrillators.

Douglas Kissell, William Hamel, and Adam Dietterich ("the Sales Representatives") previously worked on a sales team for Biosense selling AFib products in the Central Florida market. While at Biosense, each of the Sales Representatives signed an "Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement" ("Non-Compete Agreement") that contained two clauses prohibiting the Sales Representatives from engaging in certain activities for a period of eighteen months after they stopped working for Biosense. In July 2012, the Sales Representatives resigned from Biosense and began working for St. Jude. The Sales Representatives now sell CRM products and AFib products for St. Jude.

The parties disagree as to the Sales Representatives' obligations under the Non-Compete Agreements, and Plaintiffs filed the present action seeking a declaratory judgment resolving that dispute. According to Plaintiffs, the Non-Compete Agreements do not prohibit the Sales Representatives from selling CRM products to any customer or from selling AFib products to new customers or to their former Biosense customers with whom they did not have contact during the last twelve months of their employment at Biosense. Biosense contends that the Non-Compete Agreements prohibit the Sales Representatives from selling CRM products to their former Biosense customers and from selling AFib products to any customer.

In response to Plaintiffs' Complaint, Biosense filed a Counterclaim[2] (Doc. 8) against them and moved for a preliminary injunction. Biosense seeks to enjoin the Sales Representatives from using any of Biosense's confidential information, from selling CRM products to their former Biosense customers, and from selling AFib products to any customer. Biosense also seeks to enjoin St. Jude from tortiously interfering with Biosense's Non-Compete Agreements.

## II.    Analysis

### A. Preliminary Injunction Standard

"A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." Id. (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations and quotations omitted)).

### B. Likelihood of Success on the Merits

Biosense argues that the Sales Representatives are breaching the terms of their Non-Compete Agreements "by working for a competitor and by selling competing

---

[2] The Counterclaim alleges that the Sales Representatives breached their Non-Compete Agreements and that St. Jude tortiously interfered with those agreements. The Counterclaim also alleges that the Sales Representatives breached an independent duty of loyalty to Biosense, but Biosense has not addressed that claim in its Motion for Preliminary Injunction.

products for that competitor to the Sales [Representative's] former customers and new customers." (Doc. 9 at 10). Biosense also argues that St. Jude has tortiously interfered with the Non-Compete Agreements by failing to ensure that the Sales Representatives do not breach them. The specific terms of the Non-Compete Agreements are therefore of central importance to Biosense's claims.

As an initial matter, when interpreting a contract under New Jersey law,[3] courts generally should give the terms of the contract their "plain and ordinary meaning." M.J. Paquet, Inc. v. N.J. Dep't of Transp., 794 A.2d 141, 152 (N.J. 2002). Courts may not "supply terms to contracts that are plain and unambiguous" and may not "make a better contract for either of the parties than the one which the parties themselves have created." Barr v. Barr, 11 A.3d 875, 882 (N.J. Super. Ct. App. Div. 2011) (quoting Maglies v. Estate of Guy, 936 A.2d 414, 434-35 (N.J. 2007) (Hoens, J., dissenting); see also Graziano v. Grant, 741 A.2d 156, 163 (N.J. Super. Ct. App. Div. 1999) ("If the terms of a contract are clear, [courts] must enforce the contract as written and not make a better contract for either party.").

According to Biosense, "[t]he essence of the agreement between [Biosense] and the Sales [Representatives] . . . is the requirement that the Sales [Representatives] not work for a competing company." (Doc. 9 at 23). But the terms of the Non-Compete Agreements do not contain such a sweeping restriction. Rather, the Non-Compete Agreements contain two more narrowly tailored restrictions.

---

[3] The parties agree that New Jersey law governs the Non-Compete Agreements.

4

1.  Confidentiality Clause

Paragraph 6 of the Non-Compete Agreements states:

> [D]uring your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access.

(Non-Compete Agreement, Doc. 61-4).   The Non-Compete Agreements define "Confidential Information" as "information about the business of any COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by any COMPANY."[4] (Id.).

By its express terms, then, the Confidentiality Clause does not flatly prohibit the Sales Representatives from working for a competing company during the post-employment period.[5]  It only prohibits the Sales Representatives from working for a competitor in a position where the Sales Representatives could disadvantage Biosense or advantage St. Jude *through the disclosure or use of confidential information.*  While the terms "could disadvantage . . . or advantage" do not on their face have precise limits, it is clear that, at a minimum, in order for confidential information to fall within the

---

[4] "Company" includes Biosense.

[5] Interpreting the clause as flatly prohibiting the Sales Representatives from working for a competitor would also seem to render Paragraph 7 of the Non-Compete Agreements—which prohibits sales of competing products to certain former customers—a nullity.

scope of the Confidentiality Clause, the information must pose a genuine risk of affecting St. Jude's or Biosense's ability to compete.[6]

Biosense's burden in proving a violation of the Confidentiality Clause therefore entails more than merely showing that the Sales Representatives work for a competitor—Biosense also carries the burden of proof with respect to the alleged confidential information it claims the Sales Representatives received. Biosense thus cannot merely rely on conclusory assertions about the information at issue. Biosense has the burden of presenting sufficient evidence that the information was not generally known to the industry and that the information poses a risk of affecting Biosense's or St. Jude's ability to compete. In other words, in order to establish a likelihood of success with respect to the Confidentiality Clause, Biosense must present sufficient evidence concerning the information at issue.

Yet Biosense has not done so. Biosense instead relies heavily on conclusory assertions about broad categories of information to which the Sales Representatives had access. Biosense states in its Verified Counterclaim that the Sales Representatives received from Biosense:

> [U]pdated marketing plans and strategies, pricing, sales strategies, customer contract terms, competitive intelligence, strategic business plans, sales volumes and forecasts, monthly customer sales reports which identify sales by product and dollar volume, analyses of clinical data supporting [Biosense's] products, customer purchasing habits, requirements and trends, customer preferences and

---

[6] Although Plaintiffs argue that the terms "could disadvantage . . . or advantage" are "vague, overbroad, and unenforceable," (Doc. 28 at 20), the Court need not fully resolve the scope and enforceability of the terms at this time. The limited evidence Biosense has presented concerning the information at issue would not establish a likelihood of success even if the Court were to adopt a broad interpretation of the Confidentiality Clause and find it enforceable.

requirements, product launch timelines and product pipeline information, instructions and guidance on how to conduct selling activities to [Biosense's] customers, [Biosense] research and development initiatives and product pipeline information, as well as [Biosense] market share data and other trade secret and confidential information.

(Doc. 8 ¶ 57). Biosense further states that "the product pricing and discount information of which the Sales [Representatives] have knowledge is current, confidential and valuable to [Biosense]" and that "[s]uch information will be current and applicable to [Biosense] customers for at least the next year and in many cases much longer." (Id. ¶ 64).

But Biosense has provided few specific examples or documents to support these conclusory assertions, and much of the information to which Biosense refers appears on its face to be stale.[7] Additionally, although Plaintiffs point out that Biosense's lack of specificity concerning the information at issue makes it difficult for them to respond,[8] the Sales Representatives have submitted declarations calling into question Biosense's assertions about the alleged confidential information. (See Kissell Decl., Doc. 27-6, ¶¶ 27-40; Dietterich Decl., Doc. 27-7, ¶¶ 36-44; Hamel Decl., Doc. 27-8, ¶¶ 36-45). For example, the Sales Representatives attest that "[a]ll of the marketing and product-specific information" they received from Biosense was "non-confidential" and intended

---

[7] Even if the alleged confidential information were current when the Sales Representatives began working for St. Jude, if it is now stale, then Biosense's Motion for Preliminary Injunction is moot with respect to protecting that information.

[8] The Court notes that the parties are embroiled in a discovery dispute over the extent to which Biosense must disclose the alleged confidential information. Plaintiffs have filed a Motion to Compel Biosense to Disclose Alleged Trade Secrets and Confidential Information (Doc. 77), and the magistrate judge assigned to this case has scheduled a hearing on that motion for June 11, 2013.

for public distribution, (Kissell Decl. ¶ 29; Dietterich Decl. ¶ 38; Hamel Decl. ¶ 38), and

that the pricing information to which they had access was of a limited lifespan, (Kissell

Decl. ¶¶ 27-40), and sometimes publicly known, (id. ¶ 34).

In sum, Biosense has not established a likelihood of prevailing on the merits with

respect to the Confidentiality Clause.  The lack of concrete evidence concerning the

alleged confidential information at issue leaves too weak of a record on which to base

the extraordinary relief Biosense has requested.

2.  Goodwill Clause

Biosense also argues that the Sales Representatives have breached or

imminently will breach Paragraph 7 of the Non-Compete Agreements ("the Goodwill

Clause").  The Goodwill Clause provides that:

> [Y]ou will not, during your employment with any COMPANY
> or for eighteen (18) months after your last date of
> employment within the COMPANIES, directly or indirectly,
> solicit any business from, sell to, or render any service to
> any accounts, customers or clients with which you have had
> contact during the last twelve (12) months of your
> employment within the COMPANIES in connection with the
> sale of any product or service that resembles or competes
> with one that is being (or is being prepared to be) sold,
> developed or acquired by any COMPANY for which you
> worked during the last twelve (12) months of your
> employment.

(Non-Compete Agreement, Doc. 61-4).  As with the Confidentiality Clause, the terms of

the Goodwill Clause do not flatly prohibit the Sales Representatives from working for a

competitor or from selling products to former customers.  Rather, the Clause prohibits

the Sales Representatives from selling *competing* products to former customers with

whom the Sales Representatives had contact during the last twelve months of their employment at Biosense.

Biosense argues that the CRM products the Sales Representatives sell for St. Jude compete with Biosense's AFib products and also that the sale of CRM products to former customers will inevitably lead to the sale of AFib products to those customers. Biosense has also suggested that the Sales Representatives violated the Goodwill Clause by promoting AFib products to their former Biosense customers. (See Doc. 9 at 6).

According to Biosense, "the Sales [Representatives] are calling on customers, including their former [Biosense] customers, for the purpose of promoting [St. Jude's AFib products]," (id.), and "Mr. Dietterich has already violated [the Goodwill Clause]," (id. at 11). Nonetheless, Biosense has not shown that any Sales Representative has promoted St. Jude's AFib products in violation of the Goodwill Clause. Although Biosense has submitted declarations describing a number of instances in which the Sales Representatives contacted former customers, (see Singh. Decl., Doc. 10-1, ¶¶ 6-10; Strickler Decl., Doc. 10-2, ¶¶ 5-6), the Sales Representatives have replied with their own declarations explaining that those contacts either did not involve restricted customers—that is, customers with whom the Sales Representatives had dealings within the twelve-month period before they left Biosense—or that the contacts involved only CRM products,[9] (see Hamel Decl. ¶¶ 30-35; Dietterich Decl. ¶¶ 30-35).

---

[9] With respect to Biosense's allegation that Hamel called a restricted customer to sell AFib products, it is particularly noteworthy that Hamel attests not only that he called the customer only to discuss CRM products but also that he expressly informed the customer that he could not discuss AFib products with him because of his Non-Compete Agreement. (See Hamel Decl. ¶ 35).

Next, Biosense argues that St. Jude's CRM products compete with Biosense's AFib products and that sales of CRM products will inevitably lead to sales of AFib products. Biosense points out that electrophysiologists sometimes implant a CRM device in a patient after using AFib products on the patient. (Carlson Decl., Ex. 1 to Doc. 9, ¶¶ 7-18). Biosense also cites the declaration of St. Jude's Chief Medical Officer, Mark Carlson, M.D., for the proposition that CRM products and AFib products are "complementary." (Id.). Upon review of Carlson's entire declaration, however, Carlson's opinion actually cuts against Biosense's position. Carlson states that the products "*typically do not compete with one another,* but rather, may complement one another." (Id. ¶ 7) (emphasis added). Carlson goes on to state that the fact that a CRM device may sometimes be implanted after using AFib products "further highlights that *the products are not competitive,* but rather complementary, in nature." (Id. ¶ 30) (emphasis added).

Carlson's declaration clearly suggests that the two products do not compete, and nothing in the record indicates that the products' complementary nature in itself means that a Sales Representative selling CRM products to former customers will "inevitably" sell AFib products to those customers. The Sales Representatives' apparent course of conduct so far also undercuts Biosense's argument that they will "inevitably" sell AFib products to former customers in violation of the Goodwill Clause. Biosense has not shown a single instance of the Sales Representatives violating the Clause during the ten months that they have already worked for St. Jude.

Finally, Biosense attempts to make much of St. Jude's "cross-selling strategy" pursuant to which St. Jude apparently intends to have the Sales Representatives call on

their former Biosense customers for the purpose of selling both CRM products and AFib products. Nothing in the Goodwill Clause prohibits the Sales Representatives from pursuing this strategy after the expiration of the eighteen-month restriction period, however, and as explained above, Biosense has not shown that any of the Sales Representatives have actually violated the Goodwill Clause.

Accordingly, Biosense has not shown a likelihood of success with respect to the Goodwill Clause.

### III.   Conclusion

In sum, Biosense has not presented evidence sufficient to carry its burden of establishing a likelihood of success on the merits of its claims.[10]   Accordingly, Biosense's Motion for Preliminary Injunction (Doc. 9) is DENIED.

DONE and ORDERED in Orlando, Florida on May 2̲8̲, 2013.

JOHN ANTOON II
United States District Judge

Copies furnished to:

Counsel of Record

---

[10] Having failed to show a likelihood of success with respect to the Sales Representatives' alleged breaches of their Non-Compete Agreements, Biosense also fails to show a likelihood of success with respect to its claim that St. Jude tortiously "interfered with the Sales [Representatives] contractual obligations by failing to ensure that the Sales [Representatives] did not violate the terms of their non-competition obligations." (Doc. 9 at 20).

11

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Stephen V. Wilson _____ and the assigned Magistrate Judge is _____ Alicia G. Rosenberg _____ .

The case number on all documents filed with the Court should read as follows:

## CV14-1326-SVW(AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

February 21, 2014
_____
Date

By  C. Sawyer
_____
Deputy Clerk

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] Western Division | ☐ Southern Division | ☐ Eastern Division |
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| ST. JUDE MEDICAL S.C., INC. a Minnesota corporation, SARAH ELSENER, an individual | ) ) ) ) |
| _Plaintiff(s)_ | ) ) |
| v. | ) ) ) |
| BIOSENSE WEBSTER, INC., a California corporation | ) ) ) ) |
| _Defendant(s)_ | ) |

**CV14 - 1326** ꟼ𝒰ꟽ(𝒜𝒢ℛ𝓍)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Biosense Webster, Inc., a California corporation
3333 Diamond Canyon Road
Diamond Bar, CA 91765

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Todd M. Malynn, Esq.
> FELDMAN GALE, P.A.
> 880 West First Street, Suite 315
> Los Angeles, CA 90012

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: 2-21-14

_Signature of Clerk or Deputy Clerk_

1149

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| ST. JUDE MEDICAL S.C., Inc. a Minnesota corporation, SARAH ELSENER, an individual | BIOSENSE WEBSTER, INC., a California corporation |

| (b) County of Residence of First Listed Plaintiff   Austin, Texas | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| Todd M. Malynn (SBN 181595); James A. Gale (Florida Bar No. 371726) FELDMAN GALE, P.A. 880 West First Street, Suite 315, Los Angeles, CA 90012 Tel: (213) 625-5992  Fax: (213) 625-5993 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from Another District (Specify)   ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint for Declaratory Relief

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☒ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | CV14-1326 |
|---|---|---|

| CV-71 (11/13) | CIVIL COVER SHEET | Page 1 of 3 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes ☒ No | ☐ Los Angeles | ☐ Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true?** If so, check the one that applies:

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true?** If so, check the one that applies:

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   DATE: 02/21/2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |